MEMORANDUM OPINION AND ORDER
 

 CASTILLO, District Judge.
 

 Defendants are investors
 
 [1]
 
 who originally sought to arbitrate before the New York Stock Exchange (“NYSE”) their claims against plaintiff Lehman Brothers. Investors alleged in their arbitration Statement of Claim (“Arbitration Claim”) that Lehman disseminated false and misleading information inducing them to purchase grossly overvalued stock. In response, Lehman brought this action in federal district court. Lehman’s complaint requests preliminary and permanent
 
 [2]
 
 injunctive relief barring Investors from arbitrating certain of their claims, namely those involving stock that Investors bought from other brokerage firms. Lehman seeks a declaratory judgment to the same effect.
 

 The parties have now filed cross-motions for summary judgment. They submitted a joint statement of facts, stipulating that no genuine issue of material fact prevents this Court from rendering judgment as a matter of law.
 

 Lehman and Investors also agree that the legal standard governing arbitrability in this ease is NYSE Arbitration Rule 600(a), which provides:
 

 Any dispute, claim, or controversy between a customer or a non-member and a member ... arising in connection with the business of such member ... shall be arbitrated under the Constitution and Rules of the New York Stock Exchange, Inc. as provided by any duly executed and en
 
 *1335
 
 forceable written agreement or upon the demand of a customer or non-member.
 

 2 N.Y.S.E. Guide (CCH) ¶2600 (Nov. 1995). Lehman acknowledges that it is a member of the NYSE. Joint Statement Pursuant to Local General Rule 12(M)(3)(“Jt.St.”) ¶A.1. In dispute is whether' Investors are “customer[s] or non-member[s],” and whether Investors’ claims arose in connection with Lehman’s business. Resolving those issues requires this Court to decide whether Rule 600(a) permits arbitration when the parties lack a direct transactional relationship. For the reasons discussed below, the Court finds that it does.
 
 [3]
 

 RELEVANT FACTS
 

 To determine arbitrability, a court must look to “whether the party seeking arbitration has made a claim which on its face is governed by the contract.”
 
 Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,
 
 726 F.2d 1286, 1289 (8th Cir.1984);
 
 see also Spear, Leeds & Kellogg v. Central Life
 
 Ass.
 
 Co.,
 
 85 F.3d 21, 28 (2d Cir.1996) (relying on claimant’s allegations in analyzing arbitrability);
 
 Paine, Webber, Jackson & Curtis v. Chase Manhattan Bank,
 
 728 F.2d 577, 578 n. 1 (2d Cir.1984) (same). Consequently, the facts as stated in Investors’ Arbitration Claim are critical to the Court’s ruling. Their importance is magnified by the fact that the parties’ joint statement of facts sheds little light on the legal issues involved in this case.
 
 [4]
 

 Investors allege in their Arbitration Claim that they purchased stock in Great American Communications Company (“GACC”) based on the misrepresentations of Lehman and Mr. Paul Warehall, then a Lehman Chicago office employee. Compl., Ex. A, at 1. GACC was the product of a 1987 merger that left it mired in debt. In 1989, GACC sought to reduce its indebtedness by hiring Lehman to market and sell its stock.
 
 Id.
 
 ¶¶3-4. Lehman became GACC’s primary market maker.
 
 Id.
 
 ¶ 15.
 

 Shortly after GACC retained Lehman, the firm allegedly began to engage in conduct designed to artificially support and manipulate the stock price.
 
 Id.
 
 ¶¶ 5, 15. Lehman misrepresented to Investors GACC’s financial fitness, performance, and prospects, selling the stock at inflated prices. Through the head of its over-the-counter trading department, Lehman presented over-enthusiastic recommendations to its brokers and implemented a broker incentive program to facilitate quick stock sales.
 
 Id.
 
 ¶¶ 6, 10, 15. The firm also allegedly directed one of its employees, Paul Warehall, to solicit Investors to buy GACC stock using a sales script containing false and misleading statements. Ware-hall misrepresented to Investors both the stock’s value and its investment risk, claiming that GACC was and would remain profitable.
 
 Id.
 
 ¶¶ 13,18.
 

 From 1989 to 1991, Investors purchased GACC stock based on these alleged misstatements.
 
 Id.
 
 ¶¶ 42-59. While some Investors bought the stock directly from Lehman, all executed at least one GACC transaction through other brokerage firms.
 
 Id.
 

 The GACC stock turned out to be a poor investment. Its market price plummeted from $12 per share to $0.40 per share in the span of three years.
 
 Id.
 
 ¶¶ 14, 27. When GACC’s market price dipped to $3.00 per share, Lehman allegedly continued to recommend the stock and support its price by falsely stating that the share price would skyrocket when institutional short sellers were forced to “cover their positions.”
 
 Id.
 
 ¶ 19. This, however, never occurred, and by the second quarter of 1992, GACC was trading for just $0.40 per share.
 
 Id.
 
 ¶ 27.
 

 These allegations are the genesis of several causes of action: (1) breach of fiduciary duty; (2) breach of the implied covenant of good faith and fair dealing; (3) common law
 
 *1336
 
 fraud; (4) negligent misrepresentation; and (5) breach of fiduciary duties arising under ERISA. Investors seek up to $5 million in damages in each count for Lehman’s actions.
 

 All Investors claim that they bought GACC stock in reliance on Lehman and WarehaU’s misrepresentations. But not every GACC purchase was executed through Lehman’s brokerage office.
 
 See
 
 Jt. St. ¶¶ 12-21. Lehman challenges arbitration only as to the claims based on transactions with other brokers. Compl. ¶ 1.
 

 DISCUSSION
 

 Resolving arbitrability is a matter entrusted to the courts.
 
 AT & T Tech., Inc. v. Communications Workers,
 
 475 U.S. 643, 649, 106 S.Ct. 1415, 1418-19, 89 L.Ed.2d 648 (1986);
 
 Spear, Leeds & Kellogg v. Central Life Ass. Co.,
 
 85 F.3d 21, 25 (2d Cir.1996). This determination is the product of a straightforward analysis. First, the court must ascertain whether the parties have an agreement to arbitrate. If the answer is affirmative, the next task is to decide whether the scope of the agreement covers the dispute at hand.
 
 Spear, Leeds,
 
 85 F.3d at 25-26;
 
 Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,
 
 726 F.2d 1286, 1288 (8th Cir.1984). Keeping in mind that arbitration is, at bottom, a matter of contract, judges must take care to ensure that they do not force the parties to arbitrate a dispute against their will.
 
 AT & T Tech., Inc.,
 
 475 U.S. at 648, 106 S.Ct. at 1418;
 
 Painewebber Inc. v. Elahi,
 
 87 F.3d 589, 594 (1st Cir.1996). To do so would undermine the parties’ reasonable expectations, in violation of the most basic principles of contract law.
 
 See Spear, Leeds,
 
 85 F.3d at 28.
 

 I. The Parties Have an Arbitration Agreement
 

 At first blush, it appears that Investors have no agreement with Lehman at all in relation to their stock purchases from other firms. And absent this privity, it would seem that the requisite contract to arbitrate is missing. But the New York Stock Exchange provides those who have disputes with its members an alternative route to arbitration: the NYSE Constitution and Arbitration Rules. NYSE Arbitration Rule 600(a), in particular, calls for arbitration simply “upon the demand” of a customer or NYSE non-member.I. ***
 
 [5]
 
 The Rule does not contemplate a contract as a precondition to arbitration because the rule supplies the contract.
 
 Spear, Leeds,
 
 85 F.3d at 27. Courts have consistently held that Rule 600(a) alone is sufficient to compel NYSE member firms to arbitrate their disputes.
 
 Id.
 
 at 26;
 
 Hovey,
 
 726 F.2d at 1289;
 
 Coenen v. R.W. Pressprich,
 
 453 F.2d 1209, 1211-12 (2d Cir.),
 
 cert. denied,
 
 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972).
 

 Lehman stipulated in the parties’ joint fact statement that it is a NYSE member. Jt. St. ¶ A.l. When it became a member, Lehman pledged to obey the Exchange’s Constitution and Rules, including the Rule 600(a) procedures for resolving disputes.
 
 See Coenen,
 
 453 F.2d at 1211-12 (since member signed pledge to obey NYSE Rules, court had “no doubt” that member had agreed to arbitrate). Far from transgressing the parties’ reasonable expectations, this interpretation enforces the promise that Lehman made when it chose to receive the benefits and abide the dictates of the NYSE.
 

 That exchange rules create an enforceable arbitration contract has been made clear by the Second and Seventh Circuits. In
 
 Spear, Leeds & Kellogg v. Central Life Assurance Co.,
 
 85 F.3d 21 (2d Cir.1996), three life insurance companies sought to arbitrate their claims against Spear, Leeds, a NYSE member, alleging that the firm had provided its chent with information used to defraud the insurers. Although the insurers had never contracted to arbitrate or even conducted business with Spear, Leeds, the court held that such a “transactional nexus” was not necessary to compel arbitration.
 
 Id.
 
 at 25-29. The NYSE arbitration rules provided the requisite arbitration agreement.
 
 Id.
 
 at 26.
 

 
 *1337
 
 Likewise, in
 
 Geldermann, Inc. v. CFTC,
 
 836 F.2d 310, 319 (7th Cir.1987),
 
 cert. denied,
 
 488 U.S. 816, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988), the court' held that by virtue of its status as a member of the Chicago Board of Trade, Geldermann consented to resolving claims against it under the Board’s arbitration rules. This holding was based on parallel decisions regarding NYSE and NASD arbitration proceedings in other Circuits.
 
 Paine, Webber, Jackson & Curtis v. Chase Manhattan Bank,
 
 728 F.2d 577, 580 (2d Cir. 1984);
 
 see also Patten Sec. Corp.,. Inc. v. Diamond Greyhound & Genetics, Inc.,
 
 819 F.2d 400, 405 (3d Cir.1987) (NASD member “must be willing to live up to the responsibilities of such membership,” including compliance with Exchange arbitration rules);
 
 Hovey,
 
 726 F.2d 1286, 1288-89 (NYSE membership compelled employer to arbitrate employee’s claims under Exchange rules).
 

 The reasoning in these cases furthers the purposes behind the 1934 Securities Exchange Act.' The Act bestowed upon exchanges not only the privilege of self-governance, but also the responsibility for curbing member abuses.
 
 Spear, Leeds,
 
 85 F.3d at 25. Exchanges are directed to promulgate rules with an eye toward ensuring fair dealing and adequate investor protection.
 
 Axelrod & Co. v. Kordich, Victor & Neufeld,
 
 451 F.2d 838, 840 (2d Cir.1971) (citing 15 U.S.C. § 78f(d) (1970)). The NYSE arbitration provisions advance this duty to protect investors through self-regulation by providing a forum that subjects questionable member behavior to the expert scrutiny of the exchange.
 
 See Hovey,
 
 726 F.2d at 1289.
 

 With these principles in mind, the Court finds that Lehman and Investors have agreed to arbitrate disputes falling within the purview of NYSE Arbitration Rule 600(a).
 

 II. The Rule Covers This Dispute
 

 Having found an agreement to arbitrate embodied in Rule 600(a), we move on to the next step of the analysis: does the scope of the agreement embrace this particular dispute? Several general principles assist courts in discerning the reach of an arbitration agreement. First, with the passage of the Federal Arbitration Act, 9 U.S.C. § 4, Congress established a “‘federal policy favoring arbitration.’ ”
 
 Shearson/American Express, Inc. v. McMahon,
 
 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (quoting
 
 Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,
 
 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). This policy has translated into a judicial presumption of arbitrability.
 
 AT & T Tech.,
 
 475 U.S. at 650, 106 S.Ct. at 1419. Second, all doubts about the scope of an arbitration clause must be resolved in favor of arbitration.
 
 Moses H. Cone,
 
 460 U.S. at 24-25, 103 S.Ct. at 941-42. A court may not deny arbitration unless “it may be said with positive assurance” that the clause does not cover the dispute.
 
 AT & T Tech.,
 
 475 U.S. at 650, 106 S.Ct. at 1419.
 

 Rule 600(a) provides that any dispute “between a customer or a non-member and a member ... arising in connection with the business of such member” shall be arbitrated on demand. The parties agree that at issue is the breadth of the terms “customer or nonmember” and the phrase “arising in connection with the business” of a member.
 

 First, Lehman argues that for a claim to arise in connection with its business, it must be the outgrowth of a specific transaction. Lehman would have Rule 600(a) apply only to stock purchases made directly through a Lehman broker. Since Investors'did not buy the GACC stock from Lehman, the firm contends, they fail this requirement. Investors, on the other hand, argue that the “arising in connection with the business” clause encompasses all aspects of Lehman’s exchange-related business, such as market making, disseminating securities information, and making investment recommendations.
 

 Second, Lehman maintains that Investors were not its customers because they elected to purchase the GACC stock from other firms. Again, Lehman wishes to superimpose a purehase-and-sale requirement on the term “customer.” Investors reply that they did not need to have accounts with Lehman in order to qualify as customers. It is enough that they relied on the false and misleading advice of Lehman and its employees.
 

 Third, according to Lehman, Investors are not “non-members.” As used in Rule 600(a),
 
 *1338
 
 that term refers to brokers or dealers who do not belong to the NYSE. Investors rejoin by claiming that they are contemplated within the ordinary meaning of that word.
 

 Addressing these arguments in turn, and considering federal arbitration policy, the Court undertakes the task of deciding whether Investors’ claims fall within the scope of Rule 600(a).
 

 A. Investors’ Claims Arose out of Lehman’s Business
 

 The phrase “arising in connection •with the business” of a member-broker has consistently been interpreted to mean the member’s exchange-related business.
 
 See, e.g., Spear, Leeds,
 
 85 F.3d at 28;
 
 Haviland v. Goldman, Sachs & Co.,
 
 947 F.2d 601, 605 (2d Cir.1991),
 
 cert. denied sub nom., J. Aron & Co. v. Haviland,
 
 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992);
 
 Paine, Webber,
 
 728 F.2d at 580. Courts have held that this construction reflects the reasonable expectations of NYSE members.
 
 Spear, Leeds,
 
 85 F.3d at 30;
 
 Haviland,
 
 947 F.2d at 605.
 

 For example, in
 
 Spear, Leeds,
 
 the insurer’s claims against the firm were held to be exchange-related because they “implicated” matters “concerning” the NYSE.
 
 Spear, Leeds,
 
 85 F.3d at 29. The insurers, who had no direct dealings with Spear, Leeds, pointed out that in facilitating its client’s insurance fraud, the firm violated several NYSE rules.
 
 Id.
 
 The court acknowledged that while alleging such violations does not warrant an automatic determination of exehange-relatedness, it strongly supports such a finding.
 
 Id.
 
 The court explained that this was well in line with the parties’ reasonable expectations regarding arbitration:
 

 While a plaintiff might not have known the specific parties that would be harmed by its violation of Exchange rules, it should reasonably have expected that a failure to obey NYSE rules would lead a party aggrieved by its conduct to seek arbitration of a claim arising from it.
 

 Id.
 
 at 30.
 

 Like the insurers in
 
 Spear, Leeds,
 
 Investors claim Lehman violated numerous NYSE provisions. The NYSE expressly prohibits any member from communicating to the public: (1) any false or misleading statement; (2) promises of specific results, exaggerated or unwarranted claims; (3) opinions not supported by a reasonable basis; and (4) projections not clearly labeled as forecasts. 2 N.Y.S.E. Guide (CCH) ¶2472 (Jan. 1995). Investors’ allegations that Lehman misrepresented GACC’s financial fitness, performance, and prospects clearly implicate the Rule’s proscriptions.
 

 In addition, NYSE Rule 342 requires its members to supervise and control the business-related activities of its employees, and to ensure employee compliance with the securities laws. 2 N.Y.S.E. Guide (CCH) ¶ 2342 (Nov. 1993). By charging that Lehman employees Paul Warehall and the head of Lehman’s OTC trading department misrepresented the viability of GACC stock and participated in a scheme to inflate and manipulate its price, Investors assail Lehman’s supervisory practices.
 

 Accordingly, the Court finds the instant dispute to be exchange-related. Regardless of whether Lehman could anticipate that Investors would use the allegedly false and misleading information it disseminated to buy stock from non-Lehman brokers, the firm should reasonably expect to be held accountable in arbitration for violating the Exchange rules that it pledged to uphold.
 

 In support of its argument that Rule 600(a) requires a transaction with an NYSE member, Lehman relies heavily on the now-reversed district court decision in
 
 Spear, Leeds
 

 [6]
 

 As explained above, the Second Circuit soundly rejected the lower court’s transactional relationship requirement.
 
 Spear, Leeds,
 
 85 F.3d at 26.
 

 Lehman secondarily turns to the decision in
 
 Paine, Webber,
 
 taking comfort in its language emphasizing the need to uphold the parties’ reasonable expectations. But that case does not impose a transactional prerequisite for arbitration. The opinion merely
 
 *1339
 
 reaffirms the principle of exehange-relatedness, even though the facts present in that case did not justify such a finding.
 
 Paine, Webber,
 
 728 F.2d at 580. Moreover, the court specifically limited its decision to settings in which the
 
 non-member
 
 is accused of impropriety.
 
 Id.
 
 It hinted that where the member occupies the position of alleged wrongdoer, the exchange-relatedness requirement might be abandoned.
 
 Id.
 
 at 580 n. 5.
 

 Even assuming that disputes which, as here, involve claims of
 
 member
 
 misconduct must be exchange-related, Lehman’s alleged actions with respect to GACC stock easily meet the test. As Investors allege, Lehman is involved in more than simply selling stock. It is in the business of making investment recommendations, soliciting customers, and supervising its employees. Rule 600(a) does not limit arbitrable disputes to particular facets of member business, nor does it mention any need for a transactional relationship. Interpreting the Rule to allow arbitration of exchange-related claims not only comports with members’ reasonable expectations, but also facilitates the NYSE’s of self-governance and furthers the strong presumption in favor of arbitration.
 
 Spear, Leeds,
 
 85 F.3d at 21.
 

 This Court therefore holds that under Rule 600(a), “arising in connection with the business of [a] member” refers to all aspects of a member’s exchange-related activities. It finds that Investors’ claims satisfy this standard.
 

 B. Investors Qualify as Customers or Non-Members
 

 The second source of conflict regarding the scope of the arbitration agreement is whether Investors are “customer[s] or nonmember[s]” who can trigger Rule 600(a)’s arbitration provisions. The Court finds that under the definition of either term, Investors have standing to compel arbitration.
 

 1. Investors are Non-Members
 

 Lehman misguidedly spends time trying to give the word “non-member” a technical meaning that is unwarranted. The firm vigorously argues that “non-member” does not mean all persons or entities outside the NYSE. Rather, it asserts that the term refers only to brokers or dealers who are not NYSE members.
 

 To defend this interpretation, Lehman cites
 
 Farrand v. Lutheran Brotherhood,
 
 993 F.2d 1253 (7th Cir.1993), a case involving the arbitration provisions of a different exchange. The rule in that case prescribed arbitration for certain disputes “between or among members and public customers, or others,” as part of a long list of other parties eligible for arbitration.
 
 Id.
 
 at 1254. In denying arbitration, the court determined that construing the words “or others” as “all persons” was too broad in that context.
 

 Farrand
 
 is not on point. Its interpretation of entirely different language promulgated by an entirely different exchange is of little use in construing NYSE Rules.
 

 More telling is the fact that all the courts interpreting the NYSE arbitration provisions in Rule 600(a) have refused to limit the term “non-member” to brokers or dealers. These decisions reject Lehman’s restrictive interpretation1 *****
 
 [7]
 
 in favor of a common-sense approach to Rule 600(a)’s language. For example, in
 
 Spear, Leeds,
 
 insurance companies were deemed nonmembers. 85 F.3d at 23. In
 
 Honey,
 
 former employees were allowed to compel arbitration as non-members. 726 F.2d at 1288-89 (“Kadry and Erickson are not members of the NYSE,” but “may rely” on NYSE arbitration provisions). And in
 
 Paine, Webber,
 
 the Chase Manhatten Bank and its employee were non-members who could “compel Paine Webber, which is a NYSE member” to submit its claims to arbitration. 728 F.2d at 579. Lehman has furnished no explanation for why insurers, former employees, and banks are “nonmembers” but persons receiving investment advice are not.
 

 
 *1340
 
 Next, Lehman contends that the NYSE arbitration fee structure justifies confining non-members to brokers or dealers. Lehman asserts that Rule 629(i) sets lower filing fees for “customer” arbitration claims than for what the firm declares are non-member “industry claims.”
 
 See
 
 2 N.Y.S.E. Guide (CCH) ¶ 2629 (Nov. 1995). The firm submits that the NYSE’s use of the terminology
 
 “industry
 
 claims” shows that the Exchange considers non-members to mean seeurities-related personnel only.
 

 Lehman is wrong. Rule 629(i) has nothing to do with non-member claims, and therefore sheds no light on the definition of “nonmember” in Rule 600(a). While Rule 629(i) does state that customer claims are, logically, those brought by customers, industry claims are defined as those submitted by a NYSE “member, allied member, registered representative, member firm or member corporation
 
 against
 
 a public customer or other nonmember.” 2 N.Y.S.E. Guide (CCH) ¶2629 (emphasis added). The word “industry” in Rule 629(i) thus refers to the fact an industry entity or person, specifically a NYSE member, initiated the action. Consistent with its duty to protect investors, the NYSE could very well have determined that it should be easier, i.e., less expensive, for customers than for NYSE members to compel arbitration.
 

 Finally, even if this Court were to find the word “non-member” ambiguous, the Supreme Court requires all doubts, including those concerning contract language, to be resolved in favor of arbitration.
 
 Moses H. Cone,
 
 460 U.S. at 24-25, 103 S.Ct. at 941-942. This Court must send parties to arbitration unless it is certain that the asserted dispute falls outside the scope of the agreement.
 
 AT & T Tech, Inc.,
 
 475 U.S. at 650, 106 S.Ct. at 1419. Far from being positive that the term “non-members” excludes Investors, the Court finds that they fit comfortably within its definition.
 

 2. Alternatively, Investors Are Customers
 

 Nor can the Court positively conclude that Investors are not customers. Neither the NYSE nor the courts have defined “customer” as used in Rule 600(a). And the term’s lay usage is not decisive. Dictionaries differ on its scope; while the
 
 American Heritage Dictionary
 
 broadly includes within customer “[a] person with whom one must deal,”
 
 Webster’s
 
 confines the term to “one that purchases usu[ally,] systematically or frequently a commodity or service” or “one that is a patron.”
 
 The American Heritage Dictionary
 
 357 (2d College ed. 1982);
 
 Webster’s New Collegiate Dictionary
 
 280-81 (1973). Still, the ordinary use of the word “customer” contemplates, for example, the person who spends time browsing in a department store, but decides not to buy.
 

 Lehman, however, contends that under Rule 600(a), a person is a customer only with respect to the firm that sold the person the security. Because Investors did not purchase the GACC stock from Lehman, the firm argues that they are not its customers.
 

 Lehman cites
 
 Wheat, First Sec., Inc. v. Green,
 
 993 F.2d 814, 819-20 (11th Cir.1993) to strengthen its position. But that decision did not clarify the meaning of the word “customer.” It merely specified that customer
 
 status
 
 is determined at “the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint.”
 
 Id.
 
 at 819-20. Because Wheat, First had “absolutely no relationship” with the defendant investors at the time of the misconduct they sought to arbitrate, the investors could in no sense of the word be called the firm’s customers.
 
 Id.
 
 at 818. Here, by contrast, Investors clearly had some kind of relationship with Lehman at the time its employees were providing them with false and misleading information.
 

 Defining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, furthers NYSE policy and recognizes market reality. The Seventh Circuit noted in
 
 Carlson v. Bear, Stearns, & Co.,
 
 906 F.2d 315, 318 (7th Cir. 1990) that the sale of securities “is usually a rather complex and convoluted transaction which requires the expertise and involvement of several parties to succeed.” To allow Lehman to solicit Investors using allegedly bad market information without repercussion defeats the NYSE’s goals of “maintaining]
 
 *1341
 
 high standards of commercial honor and integrity among its members.” NYSE Const, art. I, § 2. The Court has considered these goals, along with the federal mandate to resolve all doubts in favor of arbitration. In doing so, the Court finds that permitting Investors to compel arbitration as “customers” upholds the parties’ reasonable expectations.
 

 CONCLUSION
 

 The Court finds as follows: first, the -parties have agreed to arbitrate under NYSE Arbitration Rule 600(a); second, Investors’ claims are within the scope of the Rule. Having met both prongs of the arbitrability test, Investors are entitled to pursue their claims before the NYSE’s arbitral body. Investors’ cross-motion for summary judgment is therefore granted. Because Investors may arbitrate their claims against Lehman, Lehman’s request for a permanent injunction and declaratory judgment to the contrary is denied. For the same reason, Lehman’s cross-motion for summary judgment is denied.
 

 The Clerk of the Court is hereby directed to enter final judgment in favor of all defendants and against the plaintiff.
 

 [1]
 

 . The defendant investors are: 1) Certified Reporting Company; 2) James K. Arthur; 3) Aquarius Travel Agency, Inc.; 4) John J. Henely, Ltd.; 5) John J. Henely, Ltd. Profit Sharing and Pension Plan; 6) Fred and Louise Parker; 7) Leonard S. Bird; and 8) Jacob and Donna Ivezich. The defendants are referred to collectively in this opinion as "Investors.”
 

 [2]
 

 . Lehman no longer seeks a preliminary injunction; its Motion for Summary Judgment asks only for permanent injunctive relief.
 

 [3]
 

 . Because the Court finds that Rule 600(a) requires the parties to arbitrate the instant dispute, it does not address the applicability of arbitration provisions in the Client Agreements that some Investors executed with Lehman.
 
 See Spear, Leeds & Kellogg v. Central Life Ass. Co.,
 
 85 F.3d 21, 26 (2d Cir.1996) (Rule 600(a) permits a customer or nonmember to "demand" arbitration as an alternative to invoking a written client arbitration agreement).
 

 [4]
 

 . It goes without saying, however, that the Court’s reliance on Investors’ allegations to resolve the arbitration issue does not reflect an assessment of their merits.
 

 [5]
 

 . Similarly, the NYSE Constitution states that “any controversy between a member ... and any other person arising out of the business of such member ... shall
 
 at the instance of any such party
 
 be submitted for arbitration.” NYSE Const, art. XI, § 1 (emphasis supplied).
 

 [6]
 

 . To be fair, the lower court’s decision was not reversed until Lehman had completed its portion of the briefing. Nonetheless, since the appellate court handed down its ruling in May, neither party has brought this authoritative decision to the Court's attention.
 

 [7]
 

 . Lehman's citation to
 
 Gold v. SEC,
 
 48 F.3d 987, 988 n. 1 (7th Cir.1995), which comments that the NYSE makes distinctions on its membership rolls between "member firms" and "non-member firms,” is curious. Its significance in bolstering Lehman’s position that “non-members” are restricted to brokers or dealers is unclear to this Court.